# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAMPS PLUS, INC., <br><br> Plaintiff, <br> v. <br><br> LAMPS PRO, LLC; RUBEN COHEN; CHRISTOPHER BRYAN; GILDA LLANES; HEMANT KOHLI; and DOES 1-5, inclusive, <br><br> Defendant. | Case No.: 2:24-cv-07435-CBM-(PDx) <br><br> **ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION  [18]** |

The matter before the Court is Plaintiff Lamps Plus, Inc.'s Ex Parte Application for a Preliminary Injunction.[1] (Dkt. No. 17 ("Motion").)

## I.  BACKGROUND

Plaintiff Lamps Plus, Inc. ("Lamps Plus") filed this trademark and trade secrets misappropriation case against Defendants Lamps Pro, LLC, Ruben Cohen, Christopher Bryan, Gilda Llanes, Hemant Kohli, and Does 1-5.  Plaintiff brings thirteen claims: (1) trademark infringement under the Lanham Act (15 U.S.C. § 1114); (2) unfair competition, false designation of origin, and false descriptions and representations under the Lanham Act (15 U.S.C. § 1125); (3) common law trademark infringement and unfair competition; (4) trademark dilution under the Lanham Act (15 U.S.C. § 1125(c)); (5) cancellation of trademark registration under the Lanham Act (15 U.S.C. § 1119); (6) cyberpiracy under the Lanham Act (15 U.S.C. § 1125(d)); (7) breach of contract; (8) violation of the Defend Trade Secrets Act ("DTSA"); (9) violation of California's Uniform Trade Secrets Act ("CUTSA"); (10) intentional interference with prospective economic relations; (11) conversion; (12) unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and (13) breach of fiduciary duty.  Plaintiff's claims arise from Defendants' use of the mark "Lamps Pro," which Plaintiff contends infringes upon its trademarks "Lamps Plus" and "Lamps Plus Pros," and from Defendants Bryan, Kohli, and Llanes' purportedly stealing confidential information from Plaintiff and sharing it with Defendant Cohen.  (Compl., ¶¶ 11, 17-18.)

Plaintiff filed this action on August 30, 2024, and filed the instant Motion on September 27, 2024.

## II.  STATEMENT OF THE LAW

---

[1] Plaintiff filed an ex parte application for a temporary restraining order and for an order to show cause re preliminary injunction.  The Court previously denied Plaintiff's request for a temporary restraining order but granted the request for an order to show cause why a preliminary injunction should not issue.  (*See* Dkt. No. 23.)  A hearing on the order to show cause was held on October 16, 2024.

A party seeking a preliminary injunction must demonstrate (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of injunctive relief, (3) the balance of equities is in its favor, and (4) injunctive relief is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Alternatively, in the Ninth Circuit, "a party is entitled to a preliminary injunction if it demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury," (3) a balance of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public interest." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (internal quotations and citations omitted). "As to the first factor, the serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Id.* (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). Therefore, "[t]he 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011).

### III. DISCUSSION

**A. Likelihood of Success on the Merits**

*1. Trademark Infringement*

The Lanham Act "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1027 (9th Cir. 2024). "Traditionally, courts apply a likelihood-of-confusion test to claims brought under the Lanham Act." *Id.* In the Ninth Circuit, this test contains eight factors articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003), as follows: "(1) strength of the mark; (2) proximity of the

goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines."

          a) <u>Strength of the Marks</u>

"Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010). "Which category a mark belongs in is a question of fact." *Id*. "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.'" *Id*. "Merely descriptive marks are . . . not inherently distinctive and are therefore not entitled to automatic trademark protection," but "can become protectable if it has acquired distinctiveness 'as used on or in connection with the applicant's goods in commerce.'" *Id*.

Here, Plaintiff argues that both the "Lamps Plus" and "Lamps Plus Pros" marks are inherently distinctive (*i.e.*, suggestive). Plaintiff offers the declaration of Mary Jensen, its Chief Growth Officer, attesting that the words "LAMPS PLUS" do not describe goods and services sold by Plaintiff, but "suggests that Lamps Plus offers more than just lamps" and that its "goods and services are superior to those of its competitors." (Dkt. No. 19 ("Jensen Decl."), ¶ 29.) Jensen also attests that Plaintiff has "exclusively used its LAMPS PLUS trademark" for 48 years. (*Id.*, ¶ 25.) Defendants, on the other hand, offer the trademark registration for "LAMPS PLUS," which states that "no claim is made to the exclusive right to use 'lamps,' apart from the mark as shown." (Dkt. No. 31-3 ("Davis Decl."), Ex. 1.) The Court finds that Plaintiff has established the "Lamps Plus" mark is strong. Plaintiff has used this mark for several years, and as Plaintiff notes in its Motion, the mark has become incontestable. Defendants' evidence does not show otherwise.

As for "Lamps Plus Pros," there is a factual dispute as to whether Plaintiff currently uses this mark in the hospitality industry. The Jensen Declaration states that "[i]n 2019, Lamps Plus' professional trade division rebranded as Lamps Plus Pros," and that Lamps Plus "continues to serve" customers in the hospitality industry "through its Lamps Plus Pros and Lamps Plus service brands." (Jensen Decl., ¶ 19, 23.) But Defendants offer evidence indicating that Plaintiff has exited the hospitality business altogether. (Dkt. No. 31-1 ("Bryan Decl."), ¶ 9, 14; Dkt. No. 31-2 ("Cohen Decl."), ¶¶ 11, 14.) Because of this factual dispute, the Court finds that at this stage, Plaintiff has not shown the "Lamps Plus Pros" mark is strong. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) ("In deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.") (internal quotations and citation omitted). [2]

Therefore, this factor is slightly in favor of consumer confusion with respect to Lamps Plus, and neutral with respect to Lamps Plus Pros, at this stage in the litigation.

### b) Proximity of the Goods

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists. [citation]. The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." *Sleekcraft*, 599 F.2d at 350. The Ninth Circuit has found the proximity of goods factor satisfied where the goods and services "are extremely close in use and function" and "overlap." *Id*.

---

[2] As for commercial strength of the marks, that "is a fact-intensive inquiry that need not be reached at the preliminary injunction stage." *Good Meat Project v. GOOD Meat, Inc.*, 2024 WL 1083462, at *5 (N.D. Cal. Feb. 12, 2024). Therefore, the Court declines to analyze commercial strength at this stage.

|   |   |
|---|---|
| 1 | Both parties sell lighting products, including custom lighting products, to |
| 2 | consumers. Plaintiff offers evidence in the Jensen Declaration that when Plaintiff |
| 3 | closed its "Lamps Plus Hospitality (Pacific Coast Contract Lighting) division," it |
| 4 | "continue[d] to serve these same customers through its Lamps Plus Pros and Lamps |
| 5 | Plus service brands." (Jensen Decl., ¶ 23.) But Defendants offer evidence |
| 6 | indicating that Plaintiff exited the hospitality industry altogether,[3] and that in |
| 7 | contrast, Defendants sell custom lighting products "exclusively . . . to the hospitality |
| 8 | sector." (Cohen Decl., ¶ 15.) Because there is a factual dispute as to whether the |
| 9 | parties sell the same goods and services to the same consumers, the Court finds that |
| 10 | at this stage, Plaintiff has not shown this factor weighs in favor of confusion. |
| 11 | c) Similarity of the Marks |
| 12 | "Similarity of the marks is tested on three levels: sight, sound, and meaning. |
| 13 | [citation]. Each must be considered as they are encountered in the marketplace. |
| 14 | Although similarity is measured by the marks as entities, similarities weigh more |
| 15 | heavily than differences." *Sleekcraft*, 599 F.2d at 351. In *Sleekcraft*, the Ninth |
| 16 | Circuit found that the words "Sleekcraft" and "Slickcraft" were similar in sound and |
| 17 | sight. *Id*. However, the court agreed with the defendants that "the distinctive logo |
| 18 | on his [products] negates the similarity of the words," but noted that "the logo is |
| 19 | often absent" and the name appears on its own. *Id*. In *GoTo.com, Inc. v. Walt |
| 20 | Disney Co.*, 202 F.3d 1199 (9th Cir. 2000), the Ninth Circuit found similarity of the |
| 21 | marks met because "[w]ith a single glance at the two images, one is immediately |
| 22 | struck by their similarity. Both logos consist of white capital letters in an almost |

---

[3] *See* Cohen Decl., ¶¶ 11-14 (stating that Plaintiff "publicly announced on its website that it was closing its hospitality business," that Plaintiff's hospitality customers told Cohen Plaintiff closed this business, that Cohen purchased "all inventory associated with Lamps Plus's" inventory for certain hotels and the "supporting materials" for that inventory, and that Plaintiff did not attend the "biggest trade show in the hospitality business" in May 2024).

identical sans serif font rendered on a green circle. The circle in turn is matted by a square yellow background." *Id*. at 1206.

Here, when viewed in conjunction with Lamps Pro's logo, the marks are dissimilar in sight—they are written with different font and Defendants' logo has a particular design as well as the tagline "THE BRIGHT CHOICE." Plaintiff submits a screenshot of "LAMPS PRO" in plain capitalized text without the logo, but it is unclear where this comes from and whether, how often, and in what contexts Defendants use this mark on its own, without the logo. At the hearing on the Motion, Defendants stated that it is unclear when and in what contexts "Lamps Pro" is used without the design logo. Plaintiff's own screenshot of Lamps Pro's website shows the mark and logo prominently displayed together. (Jensen Decl., ¶ 55.) Even taking only the words into account, the Court notes that the "presentation of the marks differs in terms of prominence, font, size, and capitalization." *Pom Wonderful*, 775 F.3d at 1129 (weighing these characteristics when analyzing similarity factor).

The marks "Lamps Plus" and "Lamps Pro" are also dissimilar in sound, as one ends in "plus" and the other "pro." However, "Lamps Plus Pros" and "Lamps Pro" are quite similar in sound. But as Defendants note, "[w]hen the commonality between composite marks is a term that is, by itself, descriptive, courts find the likelihood of confusion reduced."[4] *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*, 2013 WL 655314, at *7 (C.D. Cal. Feb. 21, 2013) (collecting cases).

Therefore, this factor appears to be neutral or at best, slightly in favor of confusion.

        d)    <u>Marketing channels</u>

---

[4] As Defendant notes, the trademark registry "shows that there are at least 241 different active trademarks that include the word LAMP as part of the trademark" where the goods and services offered include "light" and "lighting." (Opp. at 22.)

"In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC*, 775 F.3d at 1130. "Marketing channels can converge even when different submarkets are involved so long as 'the general class of ... purchasers exposed to the products overlap.'" *Id*. However, "[t]he mere existence of online advertising does not shed much light on consumer confusion because it would be the rare commercial retailer that did not advertise online." *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *4 (N.D. Cal. July 14, 2011) (internal quotations omitted); *see also Network Automation*, 638 F.3d at 1151 ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."); *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) (finding that use of the Internet to market goods "merits little weight," [g]iven the broad use of the Internet today").

Here, Plaintiff offers evidence that it advertises online—specifically, on its websites (www.lampsplus.com and www.lampsplus.com/pros) and through social media platforms like "Instagram, X (Twitter), Facebook, YouTube, and LinkedIn," and that Defendants also use an online website to market Lamps Pro. (Jensen Decl., ¶¶ 39, 41, 55.) This is not sufficient to show marketing channel convergence. *See Network Automation*, 638 F.3d at 1151. Jensen further declares that Lamps Pro is registered to attend certain upcoming trade shows, and speculates that Plaintiff's customers, who are also attending the trade shows, will be confused because they will not "understand the difference" between the two companies. (Jensen Decl., ¶¶ 56, 58-59.) Defendants offer evidence that Plaintiff "purchased a large booth to attend" a design trade show called "HD Expo," yet did not attend. (Cohen Decl, ¶ 14.) Cohen also declares that Lamps Pro markets "primarily at these trade shows, not through online marketing." (*Id*., ¶ 8.) At the hearing on the Motion, Plaintiff confirmed that it does not plan to attend the upcoming trade shows—it only seeks

8

to bar Defendants from attending the trade shows under the name "Lamps Pro." Plaintiff also confirmed during the hearing that to date, it has not attended any trade shows that Lamps Pro has attended. The Court finds that at this stage, it is not clear whether there is marketing channel convergence.

Accordingly, Plaintiff has not shown this factor weighs in favor of confusion.

      e)     Consumer sophistication

Plaintiff concedes that this factor is neutral. Defendants argue that its customers are sophisticated and submits the Cohen Declaration in support, which attests that Lamps Pro "exclusively sells custom-made and unique lighting products to the hospitality sector" and its customers "work[] collaboratively" with Lamps Pro on those products and "rarely make one-off purchases. (Cohen Decl., ¶¶ 4, 15.) As mentioned above, the evidence submitted by both sides indicate a factual dispute regarding whether Lamps Plus continues to sell to the hospitality industry. If Lamps Plus does continue to maintain a hospitality lighting business, the consumers in this industry are sophisticated and are less likely to be confused by the two marks. Therefore, the Court finds that at this stage, Plaintiff has not shown this factor weighs in favor of confusion.

      f)     Intent

The Jensen Declaration attests that Jensen "believe[s] that Lamps Pro uses the infringing marks to manufacture, advertise, market, offer, and sell goods and services in the lighting industry that are identical or highly related to the goods and services . . . by Lamps Plus." (Jensen Decl., ¶ 51.) Plaintiff submits no other evidence indicating that Defendants intended to confuse consumers by selecting the Lamps Pro mark. Defendants submit evidence in the Cohen Declaration that Cohen created Lamps Pro "without any intent to trade off Plaintiff's good will," that he chose the name "Lamps Pro" back in December 2023, that he'd explored other names before settling on "Lamps Pro," that he secured the domain name for Lamps Pro in February 2024, and that the first time he heard about the Lamps Plus Pro

brand was on a May 21, 2024 discussion with Bruce Nelson, VP of Operations for Lamps Plus Hospitality. (Cohen Decl., ¶¶ 9-10.) In response, Plaintiff argues that other circumstantial evidence suggests Cohen *did* know of Lamps Plus Pro earlier than stated in the Cohen Declaration. (Dkt. No. 35 at 6.)

Because the evidence at this stage indicates a factual dispute regarding whether Defendants intended to confuse customers by selecting the mark "Lamps Pro," Plaintiff has not shown this factor weighs in favor of confusion. *See Pom Wonderful*, 775 F.3d at 1131 (finding that failure to prove intent, actual confusion, or product expansion results in these factors being neutral, rather than against the plaintiff).

    g)  Actual confusion

"A showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Network Automation*, 638 F.3d at 1151 (brackets omitted). "However, 'actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.' [citations]. Indeed, 'proving actual confusion is difficult ... and the courts have often discounted such evidence because it was unclear or insubstantial.'" *Id*. (internal brackets and citations omitted).

Here, Plaintiff submits three instances of actual consumer confusion amongst its customers, including one instance from a hotel manager in the hospitality industry. (Jensen Decl., ¶¶ 64-66.) In *Equinox Hotel Mgmt., Inc.*, 2018 WL 659105 at *7, the court found that "eleven incidents" of confusion from potential clients, industry journalists, and a vendor constituted "sporadic episodes" were "insufficient to support a finding of actual confusion." Accordingly, the Court finds that Plaintiff has not shown this factor weighs in favor of confusion.

    h)  Likelihood of expansion

Plaintiff submits the Jensen Declaration, which attaches Exhibit R, Cohen's trademark application for "Lamps Pro Lighting." The trademark application

identifies "[r]etail store services" as a "class" of goods and services. (Dkt. No. 19-18 ("Exhibit R") at 8.) Plaintiff contends that Lamps Pro's trademark application reflects Lamps Pro's intention to expand into the retail lighting sales market, as well as "interior design consultations," and Plaintiff "offers these same services." (Mot. at 28.) Defendants submit the Cohen Declaration, which states that Lamps Pro has "no current plans to expand Lamps Pro's product line or to sell in the retail industry." (Cohen Decl., ¶ 15.) Defendants contend that Plaintiff's evidence is not enough to show a "strong possibility" that "either party will expand their business to compete with the other." (Opp. at 27.)

The evidence at this stage indicates a factual dispute as to whether Lamps Pro is likely to expand into retail sales. Therefore, this factor is neutral and Plaintiff has not shown the factor weighs in favor of confusion.

\*        \*        \*

The analysis above indicates that two of eight *Sleekcraft* factors weigh in favor of confusion, while the remaining six factors do not weigh in favor of confusion at this stage. This is largely because there are factual disputes that affect the *Sleekcraft* analysis and go to the heart of Plaintiff's trademark infringement claims; thus, Plaintiff has not shown a likelihood of success on the merits of those claims. *See Equinox Hotel Mgmt.*, 2018 WL 659105 at \*9 (denying preliminary injunction where "the likelihood of success cannot be determined on the current record," which showed that four out of the *Sleekcraft* factors favored defendants, two were neutral, and three favored plaintiff).

2.  *Breach of Contract*

"A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1017 (C.D. Cal. 2011).

11

1    Plaintiff submits the Jensen Declaration, which attest that the "Employee Defendants stole Lamps Plus' drawings, customer lists, pricing lists, and other trade secret information prior to their departure. While they were still employed by Lamps Plus, they sent an email correspondence to PCL's customers stating that Lamps Pro, would fulfill their future orders and honor all of Lamps Plus Hospitality's prices as its 'partner company.' However, Lamps Pro is not a partner company of Lamps Plus." (Jensen. Decl., ¶ 49.)

Defendants submit evidence that Lamps Pro "legitimately purchased" materials "directly from Plaintiff"—the Cohen Declaration states that after Lamps Plus announced it was shutting down its hospitality sector, Cohen made an "aggressive offer of $250,000 for all inventory associated with" Lamps Plus' inventory for certain hotel chains. (Cohen Decl, ¶ 12.) This purchase was approved by Plaintiff's Chief Executive Officer, as communicated by Defendant Bryan to Cohen. (*Id*.) Cohen also attests that he purchased "more than just Plaintiff's inventory," and that he also bought "supporting materials," which included "native drawing files, product images, and product designs." (*Id*, ¶ 13.)

The evidence submitted at this stage reflects a factual dispute regarding whether the Employee Defendants breached their confidentiality agreements, as it is unclear whether Lamps Pro came into possession of certain information by way of a legitimate purchase from Lamps Plus or by way of stolen information obtained from the Employee Defendants. Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits of its breach of contract claim at this stage. *See Int'l Molders' & Allied Workers' Loc. Union No. 164*, 799 F.2d at 551; *see also Purdum*, 2014 WL 171546, at *6 (finding plaintiffs failed to demonstrate a likelihood of success on the merits whether there were disputed questions of fact); *Hansen Beverage Co.*, 2008 WL 5427601, at *4 (same); *Arthur J. Gallagher, & Co.*, 2008 WL 205274, at *2 (same); *SoftMan Prods. Co, LLC*, 171 F. Supp. 2d at 1093 (same).

### B. Serious Questions Going to the Merits

An alternative "serious questions" standard applies in the Ninth Circuit where "a party is entitled to a preliminary injunction if it demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury," (3) a balance of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public interest." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1190; *All. for the Wild Rockies*, 865 F.3d at 1217. The "serious questions" standard is "a lesser showing than likelihood of success on the merits." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1190.

Because there are factual disputes related to Plaintiff's trademark infringement and breach of contract claims, there are serious questions going to the merits of Plaintiff's claims. Therefore, the Court next analyzes (1) whether there is a likelihood of irreparable harm, (2) whether the balance of hardships tips sharply in favor of Plaintiffs, and (3) whether a preliminary injunction is in the public interest. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190; *All. for the Wild Rockies*, 632 F.3d at 1133.

### C. Irreparable Harm

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). In *The Real USFL, LLC v. Fox Sports, Inc.*, 2022 WL 1134487, at *11 (C.D. Cal. Apr. 14, 2022), the Court denied Plaintiff's motion for a preliminary injunction because it found that "Plaintiff's delay in bringing this action demonstrate[d] the lack of irreparable harm." *Id*. The court noted that "Plaintiff relies on 'ongoing conversations' with Defendants in order to resolve the matter as the reason for the delay," yet evidence was "undisputed" that Defendants were "clear from the outset [that] they were adamant . . . that they had the absolute and unfettered rights to use the Marks." *Id*.;

*see also AEG Holdco, LLC v. Vazquez*, 2021 WL 4352343, at *2 (C.D. Cal. Aug. 9, 2021) (denying request for TRO because plaintiffs waited about three months after it discovered alleged misappropriation of trade secrets to move for an emergency TRO, and finding that this "significantly undermines Plaintiff's claimed imminent irreparable injury in the absence of the requested TRO.").

Here, Plaintiff has not shown a likelihood of success on the merits on the record currently before the Court. Therefore, no presumption of irreparable harm applies. *See* 15 U.S.C.A. § 1116. Further, Defendant Cohen filed his application to register the mark at issue on March 8, 2024. (Opp. at 14 (citing Cohen Decl., ¶ 10).) Plaintiff did not file this action until August 30, 2024. Plaintiff did not file the instant Motion requesting emergency relief until September 27, 2024. The delay in seeking immediate relief suggests there is no irreparable harm. Plaintiff argues that it attempted resolve the dispute out of court through a series of letters exchanged with Defendants between July 2024 and August 2024. Like in *The Real USFL*, it is clear from the letters exchanged between counsel that Defendants were "adamant" that they had the right to use the marks at issue. (*See* Dkt. Nos. 18-2, 18-3.) Upon discovering on August 22, 2024 that Lamps Pro "published its lampspro.com website to the public and indicated its intent to exhibit at two upcoming tradeshows," Plaintiff "promptly filed this lawsuit on August 30, 2024" (Mot. at 16)—however, Plaintiff did not bring the instant Motion until almost a month later.

As to the breach of contract claim, the Complaint alleges that each Employee Defendant entered into a "Separation Agreement" with Plaintiff that included terms prohibiting the Employee Defendants from retaining or divulging any "proprietary or confidential information" of Plaintiff's. (Compl., ¶ 69.) The Complaint alleges that Plaintiff sent a cease-and-desist letter on June 21, 2024 to each Employee Defendant stating that Plaintiff had "reason to believe that [the Employee Defendant] had downloaded and/or sent Stolen Information from Lamps Plus' internal systems to themselves." (*Id.*, ¶ 71.) The Complaint defines "Stolen

1  Information" as "confidential information, proprietary information, and trade
2  secrets" that the Employee Defendants "took possession of," but does not otherwise
3  specify what that information is. (*Id.*, ¶ 17.) In its Motion, Plaintiff argues that the
4  stolen confidential information includes "customer information, and pricing,
5  manufacturing information." (Mot. at 29.) Within these categories, Plaintiff does
6  not identify what specific pieces of information Defendants allegedly stole.
7  Defendants contend that the information alluded to in the Complaint is "not
8  considered confidential or secret in the industry," and that Cohen purchased certain
9  information from Plaintiff. (Cohen Decl., ¶¶ 6, 13.) Therefore, disputed facts exist
10 regarding whether Defendants stole any confidential information.

11 Moreover, Plaintiff has not submitted any evidence of irreparable harm
12 actually occurring. The Jensen Declaration states that "current and potential clients
13 who engage with Lamps Pro-branded service expecting a Lamps Plus brand
14 experience will be likely disappointed" and references the three instances of
15 confusion described above. (Jensen Decl., ¶¶ 62-66.) Though "[e]vidence of loss
16 of control over business reputation and damage to goodwill could constitute
17 irreparable harm," a district court's "analysis of irreparable harm" must be
18 "grounded in [] evidence" of such harm. *Herb Reed Enterprises, LLC v. Fla. Ent.
19 Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). The statement in the Jensen
20 Declaration does not provide evidence of such harm and only offers "conclusory or
21 speculative allegations," which are not sufficient to show irreparable harm. *Equinox
22 Hotel Mgmt.*, 2018 WL 659105, at *9; *see also Herb Reed Enterprises*, 736 F.3d at
23 1250 (finding evidence of potential customers complaining about possible
24 confusion is evidence that "simply underscores customer confusion, not irreparable
25 harm").

26 Accordingly, Plaintiff has not shown irreparable harm. Therefore, the Court
27 need not reach the balance of equities or public interest. *Herb Reed Enterprises*,
28 736 F.3d at 1251 ("In light of our determination that the record fails to support a

finding of likely irreparable harm, we need not address the balance of equities and public interest factors.").

## IV.  CONCLUSION

Accordingly, the Court **<u>DENIES</u>** Plaintiff's request for a preliminary injunction.

**IT IS SO ORDERED.**

DATED: OCTOBER 23, 2024

HON. CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE